Good morning, your honors. May it please the court and counsel, I'm Tim Gabrielson, Sylvia Latina, I'm from the Federal Public Defender's Office in Tucson, and this morning we represent the appellant in this habeas corpus appeal, Thomas Kemp. Will you be the only one addressing the court? I'm the only one addressing the court this morning, your honor, and I will attempt to save five minutes for rebuttal at the end of the argument. All right, thank you. As your honors know, this is a death penalty case from the state of Arizona. Tom Kemp was convicted of felony first-degree murder for the death of Hector Juarez in July of 1992. Mr. Kemp had a co-defendant named Jeffrey Logan, who was also convicted in a separate trial. Mr. Logan was given a sentence of life in prison. There are really two issues in front of the court this morning. One is a suppression issue that has to do with two statements that Mr. Kemp made to correctional officers while he was in the custody of the Pima County Jail and after he had invoked his right to counsel. The other issue is a voir dire issue that claims that he was denied a fair opportunity to ensure an impartial jury when the trial court would not allow him to revoir dire the jury as to homosexual bias after the prosecutor belatedly was enabled to present evidence of subsequent bad acts on the part of Mr. Kemp that included a sexual assault of a kidnapped victim. Do you have a discovery issue, too? With respect to the suppression, Your Honor, we do have a discovery issue. So you're taking that as a sub-issue? Yes, it is a sub-issue. In fact, the district court actually certified three claims, suppression that goes to the guilt stage, suppression that goes to the penalty phase, and the voir dire issue. We concede that with respect to suppression that the only relief that Mr. Kemp would be entitled to would be sentencing relief, a new capital sentencing hearing based on the evidence that we claim was inadmissible that came in at the guilt stage and which was considered by the trial court in sentencing Mr. Kemp to death. There is sufficient evidence presented by the prosecution for Mr. Kemp to be found guilty as he was of the felony murder of Mr. Juarez. But you raised the Edmund, I guess, Tyson issue as to the death penalty. Is that correct? Yes, that's correct, Your Honor. So you're not claiming that even if they were improperly submitted, you're not claiming that that would affect the guilt phase? No, Your Honor. There was sufficient evidence. We believe there was evidence that Mr. Kemp used an ATM card that was taken, for example, from the victim in this case. There's evidence that there are some statements that were admissible that Mr. Kemp put himself and Mr. Logan in the vicinity where the homicide victim was kidnapped from. There's just no evidence to put Mr. Kemp at the murder scene other than his own statements. The rest of the evidence is inconclusive as to whether it was Mr. Logan or Mr. Kemp who actually killed Mr. Juarez. Mr. Logan was actually the one that was caught with the murder weapon in his possession when he was arrested. Because the gun that your client had was another gun that had been acquired post-homicide? That's correct, Your Honor. It was purchased, I believe, in Flagstaff, and it was unrelated to the homicide. It was purchased during the flight of the defendants from the homicide in the Tucson area. Which issue do you want to discuss first? We'll go ahead and take them in order. Suppression first, Your Honor. Obviously, the burden is on us in order for this court to grant the relief we're requesting. We need to convince the court that the state court's unreasonably applied, clearly established United States Supreme Court law, in this case it would be Miranda, Edwards v. Arizona, and all the progeny of those cases, in order for Mr. Kemp to be entitled to relief. Our argument is that the Arizona Supreme Court unreasonably applied established law, when it determined that because there was no formal interrogation of Mr. Kemp by the two correctional officers at the Pima County Jail, that he was not interrogated within Miranda. And therefore, the provisions, the precautions that the officers must take with respect to an accused who invokes the right to counsel or invokes his right to silence, that those protections don't apply here. Both of these were not, it was after he was already incarcerated, and it wasn't, I mean, you would concede it wasn't part of the, well, you may not concede this, but it wasn't part of the initial investigation that caused him to be arrested. That's correct, Your Honor. And so they were after, and they came up in a custodial context with two different custodial officers or whatever they call them, and why isn't, you know, obviously once people get put, your client had asked to be moved, and that the, you know, custodial facility is responsible for his safety, and the officer has to make sure that you don't put people, you know, it's, for example, if someone snitched on someone, you don't put them in the same cell as the person that snitched on them, because, you know, no good can come of that. Or if there are, if there are rivaling gangs or any number here, and apparently your client requested a change from a location that involved Hispanics, because the victim of the crime he was charged with was an Hispanic, and the officer is trying to make, why, isn't it just a situation, they're trying to make sure, you know, why are you here? And why couldn't he just say, well, I'm charged with killing a Mexican, and I didn't want to be with Mexicans that might, you know, somehow take exception to that. I mean, he goes beyond that. He, if that's the formulation that we have to adhere to is that the defendant has to be cognizant that he has to, once he invokes that right to counsel, he still has to be careful what he says. But the problem that we have with that is that, first of all, at the outset of your question, in talking about why the officer questioned him in the first place, Officer Compton, the first officer, the only salient point from the officer's standpoint was that he was in protective custody. That's all the officer had to know. And to the danger that Officer Compton ran when he started to question Mr. Kemp about that status was that Mr. Kemp might incriminate himself. The Pima County Jail has three criteria that they list for how people end up in protective custody. One is that they commit a violent crime such as a murder or a rape. One is, as Your Honor suggested, if they're a snitch. And the third one has to do with race issues. In Mr. Kemp's particular circumstance, two of those circumstances applied in his situation because he was charged with a violent crime. He was charged with a murder. And he was explaining to the officer that he had his race issues. The problem with what happened here and the reason the State Supreme Court, I think, unreasonably applied Miranda was, in Innes v. Rhode Island decided much after Miranda, the court said that there can be the functional equivalent of interrogation where questions are asked either by the officers with the intent to elicit an incriminating statement or if the question asked could reasonably be understood by the defendant to elicit incriminating information. The problem in this case is Mr. Kemp, as you suggest, Judge Callahan, he may have gone beyond what he needed to say, but why does the defendant who has invoked this very important right to counsel, why does he have to be on guard as to what he could say that might incriminate him? He's not counseled in the law. He has high anxiety. He's on trial in a capital murder case and he has apparently gang members who are chasing after him. Why does he have to be guarded? He made his invocation of the right to counsel. Here's my problem in the habeas context because we're here under the purview of AEDPA and looking at it in the habeas context. So you've got the prison officials who have made this statement or one of them said, why are you here? And it says, well, interrogation means words or actions on the part of the police other than those normally attended to arrest in custody. So the statements that were made or what the prison officials heard didn't seem to be a psychological ploy deliberately eliciting. On the other hand, at least the one officer says he did initiate or potentially could have initiated the conversation. But why can't the state court reasonably determine within that purview that it was not a violation of the Fifth or Sixth Amendment rights? It's not enough that you could decide it was a violation. We have to say it was unreasonable for the state court to say it wasn't. What makes it unreasonable for the state court, given the language in Innis, normally attended to arrest in custody, that has to be more than merely listening? What is it that makes it unreasonable for the state court? The short answer, Judge Reimer, is that the- I'm Judge Acuda. I'm sorry, Judge Acuda, I'm sorry. The problem with that is that the state court did not address this claim under the functional equivalent language of Innis. It simply said there was no interrogation under Miranda. Miranda has come to be modified in the Innis decision, which came 16 or 18 years after Miranda. That's where the court first addressed the functional equivalent language and said that the- that questioning didn't have to be the type where the defendant is isolated and has the lights bearing down on him and he has inquisitors trying to force him to make a statement. It can be something much more subtle than that. In fact, in the Innis opinion, it talked about subtle forms of interrogation that might lead somebody to give an incriminating statement. Psychological ploys. But why would it be unreasonable for the state court to determine that this wasn't the functional equivalent of interrogation? We would have to say it was unreasonable for the state court to make that determination. Yes, you would, Your Honor. We're completely in agreement with that. And in our view, because the Arizona Supreme Court didn't analyze it as a functional equivalent case, it was under the misapprehension that it had to be interrogation in the traditional sense and not something that could have some other aspect to it, a less coercive aspect, but still an aspect that would violate, in our view, the Fifth Amendment. The problem here is that the- when the officer, who knows that Kemp's in protective custody, and he approaches him, and you're right, Your Honor, he did the officer twice testify. He questioned him. There's no question that he was asking the questions. But when he says, why are you in protective custody, and Mr. Kemp's answer implicates two of the three prongs of the jail procedures manual for how somebody ends up in protective custody, there's a reasonable probability that that defendant's going to say something that could incriminate himself. And Judge Callahan suggested, well, maybe he went too far. He didn't have to say what he did. That might be true. But the problem is, what response could Mr. Kemp have given? What if he said the crime I was alleged to have committed instead of the crime I committed and then followed it up with something like, but I didn't do it or something like that? It would have served up to the prosecutor, Mr. Peasley, the opportunity to tell the judge in suppression or the jury later that any follow-up the defendant said was simply a false exculpatory statement. I guess what I'm suggesting is, what was Mr. Kemp to do? Again, he's unlearned in the law, and at this point he doesn't have his lawyer present. But almost anything he could say in response except for that sort of technical response that Judge Callahan suggested, that's about the only thing he could say that maybe couldn't be somehow twisted or used to incriminate him. I don't know. I found defendants to be pretty savvy to admitting to committing a murder as opposed to not. You know, that's not rocket science there. But once he invokes, Your Honor, once he invokes, why are we attributing to him that savviness to know what he can and cannot say and what he says that could be somehow manipulated by the prosecution to be used against him anyway? Why do we put it, once he's invoked, why aren't we faithful to the initiation requirement, I guess, in Edwards? I mean, this is a case that I think demonstrates why that's so important. And the initiation requirement is still good law. Even as recently as last year, Judge Scalia wrote an opinion in Maryland v. Schatzer that reaffirmed the vitality of it. That would have cured the problem here. And, in fact, if the question is, well, what are the officers to do, I would suggest that what the officers did in Bradshaw v. Oregon would be exactly the response that correctional officers should have when the defendant approaches and engages in conversation, whether he initiates or the officers initiate. The officers should say, wait a minute, you invoked your right to counsel. You're aware you have that right. And if the defendant says, that's fine, I want to continue in this conversation. I've got stuff I want to get off my chest or whatever you want to say. But how would you even know that when you're in a correctional situation? Correctional officers don't even, you know, I mean, they know people have been arrested. They know that they're in custody. They may know, you know, they can go look at a jacket. But how would you even know whether they had given a statement, not given a statement? So, you know, by the contrary, if they had given a statement in Wade-Miranda, then that's the green light to then go talk to them. I mean, correctional officers are making sure that someone gets to court, is safe, all of those things. Well, in this particular case, Officer Compton testified at suppression that he knew that the defendant had invoked his right to counsel. So in a hypothetical case, I can see where your question is. But we still, I mean, even in, for example, in the area of Brady, we still attribute to other actors certain behaviors. The prosecution has to know, for example, what's in a police officer's file, right? So what, how would it be onerous if correctional officers are also in the business of taking statements or memorializing statements of inmates to send to the prosecutors? Well, I guess it all goes back to what Judge Acuda was saying, whether it was unreasonable for the state court to make the findings that it did. And obviously certain things that if you were looking at it factually in terms of how the court could have, that neither of them initially made a report, right? And they only sort of by happenstance, they carpooled together or something along those lines and learned about it. And did one of them never made a report or something? Eventually, I think both of them made a report. But it wasn't, so if they were really, as you're pointing out, engaging in, you know, interrogation or some sort of policy or something along those lines, why wouldn't they immediately make a report and tell the authorities? I'm just saying, you know, we have to look at was it unreasonable for them to. I hear what you're saying. I'm not sure we're making the argument that they were even engaged in some kind of subtle interrogation. What we're suggesting is given the purposes in this county jail for how people end up in protective custody, if these officers are going to be making these inquiries about why the guy's in protective custody and they already know that he's invoked his right, I think they have to be careful. And I think the law has to exclude the statement. I think that's the short of it. The law has to exclude the statement under the Fifth Amendment, really regardless of what the correctional officers knew about the invocation of the right. I think the defendant is protected whether the correctional officers know he's invoked or not. In this particular case, they knew he invoked. Did the state court make a factual finding that the officers were not deliberately eliciting or were not attempting to obtain information? The state supreme court made a finding that the questions were only geared to the incidence of custodial presence within the institution and not for the purposes of developing evidence in the case. So would we need to, in order to get around the EDPA bar, would we need to say that was an unreasonable determination of the facts? Is that also a component here? I don't have a problem with the state court saying that the officers were inquiring as to matters that might pertain to custody. What we're saying is it's an unreasonable application of Fifth Amendment law. So even if we take the facts as the state court found them, you're saying it's an unreasonable application of MS or EDPA? Yes, because the state court really didn't make any facts with respect to the functional equivalent of interrogation. That's our point. But you're not attacking the unreasonable application of the facts? The unreasonable determination? Determination of the facts. That's correct. I think we don't have – well, let me say this, and this gets into the discovery request we do make. On the face of this transcript, we cannot assail the testimony of Officers Compton and Jackson with respect to the purpose for which they claim to have been in conversation with our client. What the record does not reflect is the training, the practice within the county jail of officers memorializing conversations with inmates and passing the information on to the county attorney's office. And had there been such testimony, and that's the purpose of our discovery motion, the trial court might have taken a different view of the determination that the officers were only interested in custody as opposed to the facts of the crime. Okay. Can you help me understand the three items that you indicate as new facts? Was the state v. Eastlack testimony, the state v. Moody case, and information about Peasley, the prosecutor? Is that correct? Those are the three items that you said came to your attention after? Were there new facts? Those were items that came to the attention. Certainly it came to our attention late, but it was not information that was in the public domain at the time the suppression hearing was litigated in Mr. Kemp's case. The Eastlack case, the testimony we're talking about, there's a correctional officer named David Conto, and the testimony he gave in Eastlack was not memorialized in the Arizona Supreme Court opinion in Eastlack. It only came to us fortuitously because one of our employees was reading a book about the case and there was reference to Officer Conto's testimony in Eastlack. We went and got the transcripts. We put them before the district court. So when I looked at the information you provided in the brief on Eastlack and also looked at the Moody case, it seemed to fall within that category of you're only listening, and so therefore there's no violation of the constitutional rights of the defendant. So it wasn't clear to me why that would entitle you to an evidentiary hearing, how that supported your argument that, in fact, the officers at the jail were deliberately eliciting or asking questions they knew would engender an incriminating remark. Can you help me understand that? Absolutely, Your Honor. And Mr. Catani's predecessor, Donna Lamb, makes the argument in her brief that that's what we're alleging those cases for. We tried to point out in the reply brief that's not what we cited those cases for. The cases stand for the proposition that sometimes the officers at the Pima County Jail serve as the conduit for statements to run from criminal defendants to the county attorney's office, not that the officers deliberately elicit the information from the defendants, although in the Moody case a superior court judge had given an order for the officers to stay away from the defendant because they were eavesdropping his confidential phone calls and things like that. But, no, the point wasn't... But in Moody he knew the officer was there, he talked really loud, didn't turn his back, didn't do anything, right? Yeah, well, Your Honor, there are also some mental health issues in Moody that are sort of beyond the scope of this. Some of them are described in the reported cases. Can you see how it applies to this particular factual situation? The answer to Judge Yakuta's question is that the information, whether it's eavesdropped or solicited by the officers, the point is simply that officers are trained to memorialize and to pass the information on. But that wouldn't be a violation of the constitutional rights under the Supreme Court cases. The listening and passing on seems to fall into the merely listening category. That's correct. But we're not citing them for the legal proposition that something illegal happened because they passed the information on. We're saying officers in that jail passed information on to the county attorney's office. But how does that help you? Well, because in our particular case there was no evidence before the trial court judge in suppression as to whether there was any pattern of practice on behalf of the county jailers in that particular county to elicit the information. We cited one case where it says the officers were given paper and pencils in order to record, in order to memorialize things that happened with the inmates. So what's the connection between recording and being a conduit as supporting your argument that there was deliberate eliciting? That was where I didn't see the connection. The only connection is that in other cases there were circumstances where correctional officers in this county jail obtained information from these inmates, passed it on to the county attorney's office. Our suggestion is that officers Compton and Jackson, somewhere in there, they were trained as county sheriffs before they got their assignments to the jail. They were trained at some point to memorialize statements. But if they were trained, they didn't do a very good job because they didn't even do it, how they talked in their carpool. Right. They did it at some point, as Your Honor suggested earlier. It eventually came to them that maybe that was important. And the thing about Mr. Peasley, the other half of your question, Judge Ikuda, was what does Peasley have to do with this? This is a prosecutor who played fast and loose with the rules fairly routinely. He was eventually disbarred for his conduct in two capital homicide cases in Pima County. He suborned perjury from a police officer in two different trials. But that doesn't relate to the deliberately eliciting. I guess my question is what entitles you to an evidentiary hearing? What facts, new facts that you didn't develop because they're new, entitles you to an evidentiary hearing on, as I understand it, on whether the particular officers at the facility were deliberately eliciting or providing remarks to try to draw out the defendant? In Ennis v. Rhode Island, the U.S. Supreme Court says there's two prongs to the inquiry where there's not the direct interrogation that Miranda talks about. One is the intent of the officers. These officers testified at suppression that their intent was only the custodial setting and not to obtain incriminating evidence. There was a finding on that, right? Yes. On the record, that was before the court. And you said you weren't challenging that actual finding. As that record said at the conclusion of that suppression hearing, what we are challenging, what we are seeking discovery on, we want to know whether Officers Compton and Jackson and the other officers actually are instructed to use psychological methods or to engage inmates in conversations that will turn out in their implicating themselves in a crime and then memorializing that and passing it on to the county attorney. And that gets back to my original question, which is why do these new facts support that allegation? It doesn't seem to be related. The new facts suggest that they were trained. Because I don't think on this record, it's not clear that defense counsel was on any kind of notice that this kind of information gathering was going on at the jail. Defense counsel didn't have to be vigilant about the contacts his client was having with these officers on a daily basis. Are you saying that the evidence of recording and acting as a conduit makes it more likely that they were deliberately eliciting information from the inmates and therefore the state court's fact finding was wrong? Yes. I think that and how best to say that. In conjunction with what we know about Mr. Peasley and his practices in suborning perjury from other police officers and such, on the face of it, it's possible these officers just testified truthfully and there's nothing more to it. But if they were given instruction, if they were told that there are- But there isn't anything in the record that they didn't testify truthfully at this point, right? No, at this point there isn't. So that would help you if that were there. Unless Judge Acuda has other questions on that, I know you want to talk about the voir dire. And what I'll do is use the rest of your time for talking about the voir dire and I'll give you five minutes on rebuttal. I appreciate that, Your Honor. Thank you. The voir dire issue comes down to this. Was it unreasonable for the state supreme court to say that in response to the federal constitutional claim that was alleged, was it enough for Mr. Larson, the defense attorney, to have had the ability at the beginning of voir dire to voir dire this jury on homosexual bias prior to the trial court ruling admissible the evidence that Mr. Kemp committed a homosexual assault on a kidnap victim subsequent to the murder? Okay, but let's talk about what Mr. Larson knew before he started the trial. He knew that the victim was naked and executed. And you don't have to get someone naked to execute them. He knew about there was some sort of diary that talked about homosexuality and he knows about the Lee situation, right? So you've got the homosexual overtone going on here. Now, Mr. Larson obviously hoped to keep as much of that out as possible, but that we can never know in any. So we can't deny that he knew all of that. He didn't submit initial questions, right, to voir dire on anything of a homosexual nature, and I don't think he could have realistically expected that the fact that the victim was nude for that to be excluded. He knew that the Lee thing was in contention, and he also and the prosecutor, Mr. Peasley, had, you know, that was all in the mix. So why, you know, why isn't that some sort of strategic decision? And then even then after when the court made certain rulings, he said he wanted to revoir dire, but then he drops the ball, you know, but then he decides no again. He doesn't do it again. So why was the court unreasonable in coming to that conclusion? Well, I don't think he decides not to revoir dire. He does at the conclusion of the hearing that's made after voir dire, he does tell the judge, I think it's at the excerpt page 308, he says I want not just this juror we just talked to on the witness stand, but we want the rest of the jury voir dired as well. Here's the problem. But then they go home that night and then they come back the next day and nothing happens, right? Yeah, ultimately in response to your question, the judge never rules on the motion. The judge never rules on the renewed motion for him to voir dire. He's already raised that issue once previously in that hearing. But he's sitting there the next day and he knows that the jury is there and he knows what the evidence is and he doesn't insist. Well, he asked to be able to do that once and it was denied and he asked the second time and it wasn't ruled on and at that point you're right, he let it go. What did he say the first time? Because I thought it was in the context of if we're going to have this homosexual onslaught or something like that, then I want to voir dire the jury. That's correct. It's clear to me that he even formally said to the judge or made a motion to voir dire. He just gave that conditional sort of remark. Did he actually make a motion to voir dire? I thought it was in that context that he did, Your Honor, and I'll check that when I sit down and I'll respond to that. But the problem, and sort of getting back to the facts as laid out by Judge Callahan, while it's possible that he certainly could have, I think the judge would have allowed voir dire on homosexuality from the get-go, what Mr. Larson had in front of him, though, with respect to how Mr. Juarez's body was found, was there is no other evidence to connect Tom Kemp to the crime scene where the shooting occurred other than the statements to the correctional officers. And if he's ultimately successful in getting the jury to reject that. Yeah, he's got to make some choices, and it depends on, you know, trials are all about how things fall into place and what the choices are. And if you're the court, you know, I know if I were the judge in this, I would be reluctant to ask any questions about homosexuality if the defense didn't want me to from the standpoint because I could be messing their defense. But that's not this case, right, Your Honor? I mean, he did make the request in this case. Well, not initially. Well, ultimately he did, and he got an adverse ruling on the request to revoir dire, and then I agree with both of Your Honors. At the very end, when he renews that motion at the end, he doesn't persist in getting the judge to make a ruling, but he already has made the motion, and it's been denied. I don't know that he has to ask yet again for it on that next day of trial. Just to put this in the EDSA context, the Supreme Court has not ruled on your right to voir dire about homosexuality. It's only been on racial issues. And so we have to say it's unreasonable for the state court to say that that wasn't a violation of the constitutional rights. It didn't make the trial fundamentally unfair. So we actually have to say it was unreasonable. Why was it unreasonable for the court to conclude that the Constitution didn't require that voir dire? Because Mumine v. Virginia does require that when questions are put, when the defense asks that certain questions be put that are going to elicit biases that will impact on the jury's ability to be fair and impartial, those questions should be asked. In the context of Mumine, the U.S. Supreme Court said that was a pretrial publicity case. That judge lived in the community, so he knew what the publicity was. They said it was okay. We deferred to the trial court on voir dire, and it didn't actually say that there was any constitutional violation in the way the judge handled the voir dire. And so why couldn't the state court say, you know, given the broad rule that the Supreme Court has laid down, we think this falls on the side of no fundamental unfairness on this homosexuality issue, like the beard in the other case. I think the problem here is, of course, the Arizona Supreme Court didn't analyze it in any terms close to what you're talking about, Judge. They simply said that he had a chance to voir dire. They didn't cite a single case. They didn't do any analysis. But that's okay, right? The U.S. District Court, Judge. Well, we know from a recent case that if there's no reason, if there's a summary dismissal of the claim and nothing is said, we know that that applies. Then there can be a search done to see what arguments could have been mounted with respect to that or what justification the state Supreme Court could have used to deny the claim. But that's not what happened here. Here there is an attempt by the Arizona Supreme Court to address the issue, but it doesn't do it in any way, shape, or form that could be construed as any kind of constitutional analysis. And the U.S. District Court, Judge Zapata recognized that when he got the case in the district court. He's the one that supplied the Mumin framework and so forth because the Arizona Supreme Court had done nothing with that. Well, I mean, early the PAC or the Supreme Court said the state court doesn't have to cite our cases and doesn't even have to know our cases. And so there is really no requirement for the state court to make a constitutional ruling as long as it's not unreasonable or it doesn't use the wrong rule. I guess the question would be did the state court use the wrong rule here? I think in part it did. I think even the U.S. Supreme Court recognizes that there is some due process that attaches to orderly state trial procedures. There's cases like Ohio Adult Parole Authority versus Woodford and others that talk about how even in the state context there is federal due process that applies. In Arizona there was a criminal discovery rule that required the disclosure of, among other things, prior bad acts and so forth within 30 days after the arraignment. For six months prior to trial, defense counsel is asking the judge to enforce the rule until Mr. Peasley, he has to fess up about whether he's going to try to get the Edmund Lee testimony in or not, and the judge keeps putting him off. And Peasley is very shrewd. He waits until that jury is impaneled that morning, and then he goes to the judge and says, okay, judge, we've decided we want to bring in the Edmund Lee testimony. And at that point that's when Mr. Larson says, well, wait a minute. We would have worked here differently if we had known that that evidence was coming, and you sandbagged us on that. So that judge had an obligation, that trial judge had an obligation to hold Mr. Peasley's feet to the fire, as required by Rule 15.1, and make him say whether he's going to try to get that evidence in. Just to finish the point or a response with respect to what Judge Callahan said, did Larson reasonably know that the evidence of homosexuality was going to rear its head in this case or not? As I started to say, it was unclear. If you take out the correctional officer's statements, it's not clear who marched Mr. Juarez out into the desert and shot him. The pathologist who testified said the evidence was inconclusive as to whether she could say there was a sexual assault or not. So I don't think we require a defense attorney to bring in information to a jury that could have the effect of prejudicing certain members of that jury against the client without the ascertainment of what that evidence is that's coming in. Defense counsel had a right to know that that evidence was coming in prior to the point when Mr. Peasley announced he was seeking its admission. And the judge did not hold his feet to the fire, and Mr. Larson and his client should not have been held responsible. The additional voir dire could have taken only moments. They had extra jurors sworn in. I mean, it's not like this procedure would have taken a lot of time or would have backed up this trial for any length of time if the judge had agreed to the revoir dire. I think Mr. Larson, I think his motion was timely in light of the fact that Mr. Peasley was so late in disclosing the information. And Judge Yakuta, in response to your question about – Why don't you sum up on this because you're already six minutes over and I'm going to still give you five more minutes. Okay, I appreciate that, Judge. The – well, let me just rest there and I'll come back to you. Okay, and I'll give you five minutes. Judge, and I appreciate your undertaking this. No, we want to have all our questions answered and have you have your opportunity to say what you came here to say. Good morning. Good morning. May it please the court, counsel, Kent Katani on behalf of respondents. I'd like to start briefly with the second issue regarding voir dire. Okay, thank you. I think we – hopefully we focused this for you so you can see where our questions are. Yes, and I think the court has pointed out that the indictment put Mr. Kemp on notice that this would be an issue, that homosexuality would potentially be an issue. The indictment listed kidnapping with intent to commit a sexual offense. Additionally – So even if – so it wasn't that it was getting in a bad act or another act. It was charged in the indictment. It was charged in the indictment. So it would be the elements – it would be evidence that would be admissible to prove the elements of that particular charge, right? As this court has pointed out, the evidence was the body was found nude other than shoes and socks in the desert and it obviously wasn't necessary to disrobe the victim to shoot him in the back of the head. Additionally, on December 23, 1992, which was – It wasn't kind of – it wasn't clear from the record. What was the actual conduct? The conduct? The sexual conduct on Mr. Lee. Was it a fondling? It said it was on Lee. On Mr. Lee, the testimony was that he touched him all over. He touched his genitals and that was it. And Mr. Lee was disclosed on a list of potential witnesses six months prior to trial. So Mr. Kemp's attorney knew that the indictment listed kidnapping with intent to commit a sexual offense and had listed Mr. Lee as a potential witness. So certainly the information was there. And additionally, the Logan trial occurred before this trial and Lee testified at that trial. So the information – he knew about the information. The question about whether it was going to be admitted or not, certainly he could have filed a motion in limine much earlier. The reason there was not a ruling on the motion in limine was that his motion in limine was filed approximately seven days prior to trial. The court said, I haven't seen that yet. So there wasn't a ruling because he didn't file it until that late date. Well, Mr. Gabrielson seems to be arguing that the court was required to hold Mr. Peasley's feet to the fire and say, okay, what's the evidence going to be, in or out? Well, I think it was clear that the evidence was going to be in that the body was found nude in the desert. So I don't know that Mr. Peasley could have done anything more on that. That was the evidence. Well, but there was also the homosexual diary, I guess, and then there was also what was Mr. Lee. Right. So did Mr. Larson have a right to know that prior to the jury being selected? Well, Mr. Larson knew that Mr. Lee had been listed as a potential witness, and he was certainly able to interview him. And he knew the facts of the touching in the motel room, and he was perfectly capable at that point of filing it. He's on notice. That's the discovery. He knows about those facts. If he wants to file a motion in limine or a motion to preclude, he certainly could have done that. But it was clear what had happened to Mr. Lee in the hotel was known to defense well before the start of this trial. And with regard to the requests that were made, as the court has pointed out, there were no suggested questions regarding homosexuality in the proposed voir dire. And the issue initially came up, my recollection is that it came up with regard to questioning of prospective juror number 15, whose wife's sister had been the victim of an incest victim. And Mr. Larson asked for follow-up questioning of juror 15. And the court concluded that the incident had happened 20 years ago. It was the prospective juror's wife. And the prospective juror indicated that he could be fair and impartial, that it would not affect his deliberations. And so the court said, I'm not going to go any further on that. So that was the initial question. Mr. Larson had just indicated that I think homosexuality may become an issue for this juror. So the initial request was just for follow-up questioning on juror 15, who, by the way, did not serve on the jury. The next reference is during the discussion about what's going to come in with Mr. Lee, and there's still a question about whether the journal of the sexual activity that Kemp kept and photographs of boys and men, of naked boys and men, would come in. And Mr. Larson's statement was, if there's going to be this onslaught of homosexual activity, then I'm going to want to revoir dire the jury. Well, the court, subsequent to that, limited what came in and sanitized, to a certain extent, the testimony of Mr. Lee and limited it to I was in a hotel room involuntarily with Mr. Kemp and he touched my genitals and that was it. None of the photographs came in. The journal did not come in. So there was not an onslaught of activity. So all we have is Mr. Larson saying, if there's going to be an onslaught of homosexual activity, I'm going to want to revoir dire the jury. Well, after that, there's a ruling there's not going to be an onslaught of homosexual activity, certainly not this journal that Mr. Kemp had kept that made details of the anatomy of people that he'd had sexual encounters with and these photographs. And so certainly Mr. Larson could have made a motion after the court ruled limiting what was going to come in and he did not do so. And the Arizona Supreme Court's ruling suggested that if Mr. Larson had wanted to ask questions regarding homosexuality, he could have. Well, so that happens, then doesn't they go home for the evening and then they come back the next day? Well, the only thing that happened before they passed the panel was the questioning regarding Juror 15. All right, so when the request to, well, I'm going to have to revoir dire. Now, your position is that wasn't really a request to revoir dire, it was sort of a, I'm going to have to. If there's going to be an onslaught, I'm going to want to. But he'd already passed the panel. At this point, they're now addressing the motions in limine. Okay, and then they rule on the motions in limine. And there's no further request. No questions were ever submitted. And when he made the initial statement or the statement, if there's going to be an onslaught of homosexual activity, there was no suggestion, these are the questions I would like to ask. There has never been any suggestion. These are the questions that should have been asked. Okay. As this court has indicated, under Harrington v. Richter, I read it differently than counsel reads it. And it's not just did the court apply the wrong test, it's did the court do something that's inconsistent with controlling United States Supreme Court authority. And I don't think anything that the Arizona, either the trial court or the Arizona Supreme Court did here, is inconsistent with controlling United States Supreme Court authority. There was no argument at the post-conviction proceeding, either regarding that this could have presumably been raised in the context of ineffective assistance of counsel, that counsel should have done something differently, that he could have asked questions X, Y, and Z. And this was not raised in the post-conviction. With regard to the first issue, the court has made the point that when Mr. Kemp was initially placed in custody, he was not placed in protective custody. He was in general custody, which undermines this argument that the officers necessarily understood, based on where he was placed in the jail, necessarily knew something about the facts and circumstances of the offense. He was initially placed in the general population, and he subsequently asked to be moved to protective custody. And there are all kinds of reasons why he could ask to move into protective custody. It could have had something to do with the charges, but there could also have been a fight in the jail. The officers, as you've indicated, were doing what they need to do to protect the safety of the inmates. It is the case that Compton initiated the conversation with Mr. Kemp, right? I think the record suggests that Compton, it doesn't so much with Jackson, the second officer, but that Compton initiated, because Compton saw that he was, Compton knew that he had been in general custody. He's now in protective custody. So Compton... So why does, as Mr. Gabrielson said, why does he need to know more? Well, he needs to know if, for example, he's gotten in a fight with an inmate. As I think Compton testified, I need to make sure I don't put him in the wrong place next to the wrong guy. So I think he would have been negligent. If you're in protective custody, aren't you in the hole for 23 hours and then you get to go out in the yard by yourself for an hour? So how would you get in the wrong place? Well, I don't know the exact details of what happens in the jail, but I assume passing... I don't know from a personal standpoint, but this is what I hear. Well, and I'm just suggesting that if it's a group of people, I would think the jail personnel would want to know if you have a concern with a group of people as opposed to there's one inmate. I would think they would be negligent in not finding out, and they don't necessarily have to find out from this inmate, but I'm just suggesting that the reasons for the protective custody are important for the inmate's safety. Maybe I think from Judge Akuta's prior questions you could say, what are the factual findings that, from an EPSA standpoint, that we're stuck with? And then what, you know... So to get where Mr. Gabrielson's asking the court to go, he said we wouldn't necessarily have to attack the factual. Well, and I disagree because I think the state court's ruling is essentially that there was not the functional equivalent of interrogation. This was simply a question that had to do with the day-to-day operations. So is that a factual or a legal determination? I mean, the deliberately illicit does seem very factual, but whether it's the functional equivalent of interrogation or not seems more like a mixed question perhaps. Well, the functional equivalent of interrogation I think we can look at, but based on I think it's clear, and particularly with Officer Jackson, the testimony is he didn't recall who even initiated the conversation, and defense counsel essentially conceded at trial that he had not established that it was involuntary. He conceded voluntariness and said, well, I'm just going to argue essentially this point, that he didn't know that he could just as easily have been saying I'd been charged with something as opposed to I killed someone. It was a question, so interrogation in the formal dictionary definition is a question. The officer confident initiated it, and Ennis directs us to look at the perceptions of the suspect and the suspect's viewpoint. And in the Sixth Amendment context, it seems like there's more of a concern about getting around the defendant's Sixth Amendment rights that there's a counsel, you shouldn't speak to them directly. Why couldn't as a legal matter the state court have been wrong in saying it's not a Sixth Amendment violation? Well, the focus in the Sixth Amendment analysis is on deliberate elicitation of a statement, and I don't think there's any indication of deliberate elicitation. Well, he asked them a question, so, I mean, there's... It wasn't just biographical. I mean, there was the one case where it was just biographical. This was sort of why are you here, right? What was the question exactly? Well, the why are we here is the, I think, is the defendant, is the suspect making that statement. Why are you in protected custody? Why are you in protected custody, yeah. Right, but that goes to... That could be because I murdered someone or because, you know... Right, and I agree that there's... We're on a spectrum here. It's would you like a glass of water. It would obviously... It's probably the right answer. Yeah, that's what I'm saying. There's obviously... Those would be just the normal you're in custody, but what I'm suggesting is this is more closely, more closely approached as that. It is necessary for the jail officers to know why someone has been moved into protected custody. It could have been a fight in the jail, and I just need to know who to avoid in moving him through the jail. And the question wasn't did you kill a Mexican? It was why are you in protected custody? And this is someone... Keep in mind, we can look at this and see his responses to his questioning from Detective Salgado, where he stopped short of... He answered the questions that he wanted to answer, and when he got to questions that he thought were troublesome, he said that's where I'm not going to talk to you. So this is someone who's fairly sophisticated, and certainly if you read his allocution, he's someone who has a command of the English language and understands... I mean, it's a very eloquent, if not ill-advised, I guess eloquent's the wrong word, but certainly it demonstrates that he's someone who... You mean about the remorse? About the remorse and about how he stayed his hand. He was ill-advised not to have stayed his hand to kill the co-defendant as well. And so there's nothing that would have prevented him. He certainly was capable of taking a question and saying, I've been charged with killing a Mexican. And counsel made the point, well, that still would have hurt him. I don't think it would have. To have said, I've been charged with killing a Mexican is my reason for being in protected custody. There's nothing the prosecution can do with that. What would you argue to the jury with? He told the correctional officers he was charged with killing a Mexican. It is a statement that is essentially volunteered on his part, and that's what the state courts found, that he essentially volunteered that information because it wasn't necessary from the question that was asked. And keep in mind that we had a suppression hearing. Both officers testified, Compton and Jackson. Kemp chose not to testify. So we have the testimony. They did make credibility assessments from officers Compton and Jackson, who indicated their intent wasn't to find out facts and details of the crime. And counsel suggested that Officer Compton knew that Kemp had invoked. And I'm not positive, but I don't want to concede that. My recollection is Officer Compton said, I knew that he had killed someone. I thought it was a taxi driver. I don't recall from the testimony Officer Compton saying, I knew that he had invoked his Fifth or Sixth Amendment rights. On the discovery issue that flows out of that, I had asked Mr. Gabrielson if there was any, you know, what would he have to show to make this more than a phishing expedition? And I said, well, there isn't an allegation that the officer, there's nothing in the records saying the officer's not telling the truth. I mean, there are the, you know, there's the other argument about whether it was a functional equivalent of an interrogation or whatever, but there isn't anything saying that the conversation was other than it was. So what would, from your perspective, what would Mr. Gabrielson have to show to make this more than a phishing expedition? Or what could he have done to entitle him to discovery? And I think that Judge Acuda also had a discussion about, he cited additional, I think, Moody and there was- He's left. Yes. He cited those cases which were, you know, how did those help him or not help him from your perspective? Preliminarily, I think it's important to note that this is not something that, this presumably could have been raised in post-conviction. There's been no showing of diligence. This wasn't raised until the district court. There was a post-conviction proceeding. This issue was not raised. The cases Eastlack and Moody don't help in any way. I think it would be negligent for jail officers not to be attentive, to listen, and report what they hear. There's simply nothing unconstitutional about listening. And so those- And so if there is a policy to listen, what you're saying is that doesn't show a policy to- That shows good police work, good work on the part of people who are running these jails. We want them to listen and be attentive. But here what they're alleging is that they were at, that maybe they have training to engage people in protective custody of why they're there, hoping that they could get confessions out of them. Well, that would be a fishing expedition. They could have attempted this fishing expedition in state court. Certainly the Eastlack and Moody cases don't suggest a basis for a fishing expedition. The other facts that counsel has suggested relate to the prosecutor and what he's alleged to have done in other cases, and that simply has no bearing on this case whatsoever. When we address ineffective- It's troubling when you hear it. Pardon me? It's troubling when you hear it. No, you know, it falls under the category you hate to hear that. Sure, but you, and you particularly hate to hear it because there isn't really a forum in which to address particular allegations. Well, does it cast doubt on the testimony of the Compton and Jackson and this cast doubt on the state court's factual finding? No, none whatsoever. There's no suggestion, and Kemp is not arguing at this point that there's any question that those officers testified truthfully. So it's really irrelevant. When we address ineffective assistance of counsel claims, we don't look to what a defense attorney did in a different case. We're looking at the record in a particular case, and certainly we're looking at this record here, and where you have what's clearly truthful testimony. There's no question about that, that what a prosecutor has or has not done in another case would not be relevant to the AEDPA issue that we're addressing here. Let me ask you about the AEDPA bar on evidentiary hearings under 2254E2. Are you saying that Mr. Kemp could have developed the factual basis of this claim in state court proceedings, in post-conviction proceedings, so the AEDPA bar against evidentiary hearings is in play? Because I understood the opposing counsel to be arguing that this new information about the East Lack case, for example, didn't come to their attention until after their time for state proceedings had run out. That's exactly what I'm suggesting, because they could have raised some of the discovery that they wanted to do was questioning these two officers. They obviously had an opportunity to question the officers prior to trial and an opportunity to cross-examine them. This new information is just new information that officers do a good job of listening and paying attention in trial. That's nothing that's worthy of, gee, I think this is something that points us in the direction of we now need to go on a fishing expedition. I think all it is now is a fishing expedition. If those cases had shown at the jail that there was some sort of policy to question people in protective custody, would that possibly create enough to have a hearing? If there were some cases, it would be a closer question. I think given the clear testimony here that they were interested in why he was in protective custody and given that that's a legitimate question, why has your status changed? This would arguably be a different case if he had just initially been placed in protective custody and they just go in and out of curiosity, why are you here? But initially he was placed in the general population. So the question that's being asked is necessarily benign in terms of I want to know about the facts and circumstances of your offense. If you wanted to know that, it doesn't have to do with why you've been moved from the general population. What happens if you've been in prison? That's the more logical reading of that. These officers want to know what's happened since you were placed in the general population. Why are you now wanting to be moved to protective custody? Like I say, it could just as easily have been a fight with someone in the jail. So even if there were some, certainly that would be a better case for them. If there were some cases out there that suggested that there's some policy of you need to go in and ask them did you kill the victim or are you guilty of the offense, this would be rather sophisticated training for them to go in and ask a question that's clearly something they should be asking and they should be figuring out for the safety of inmates. And there's just no suggestion of some sophisticated level of training. Let's go in and ask this type of rather benign question in the hopes that we can get them to say something. Keep in mind these are people who are there awaiting trial. This isn't the opportunity to develop new evidence. That's why this case is so clearly different from Messiah and cases where the government deliberately elicits information. There's simply no indication from the record and these other cases, Moody and Eastlack, that that's a practice of deliberately eliciting information in violation of a Sixth Amendment right. With regard to the, finally, the only other point I'd like to address is the Edmund Tyson finding. I think it's clear and I think it's important to separate out Compton's statement and Jackson's. They don't really need to be separated. They're both admissible, but it's clear there was no argument that it's a voluntary statement and the testimony from Jackson was it just came up in conversations. It's not really even clear who initiated. Well, now, Mr. Gabrielson is saying that it only affects the penalty phase. Right. The determination. It doesn't affect his finding, the guilt phase. Right. Is that your understanding? Yes, I agree with that. So if both of them were out, is there enough? I think there's enough without it. And when the trial court was going through the factors, the trial court listed the fact that Mr. Kemp, the confession to the jailhouse officers, the jail officers is the last factor the trial court listed. It is the first factor the Supreme Court lists, but the trial court starts with, I believe it's the, he's seen on surveillance photos, he bought the gun. He's the one that bought the gun. He is the one who lives in Tucson. Logan is the one who comes in from out of state. Kemp is the one who's there. Kemp buys the gun that's used to kill Mr. Juarez. And Kemp is the one whose photo is identified as being the one on the surveillance photos. So I think that's enough to satisfy the Edmund Tyson finding. I mean, certainly the confession. Well, Edmund Tyson, though, what has to be shown? Significant involvement in the crime, either intent to kill or significant involvement in the crime with reckless indifference. Reckless disregard for human life. Reckless disregard for human life. How do you get that from the buying the gun in the ATM photo? How do we get to that? Well, it's a circumstantial case, but he's bought the gun. It's clear that he's involved with this robbery, and then the body is found, the body is taken out to the desert and killed. Well, is the evidence, let me just, is the evidence about Mr. Lee and the fact that the body is found nude, is that more evidence that Mr. Kemp is involved in the act against the victim? Yes, that's exactly right. That was another point I think the trial court noted. That certainly is evidence that was admitted. It's properly admitted. He's found nude. We know Kemp engaged in a sexual assault on someone shortly after in a motel in Flagstaff, so the evidence does point to Mr. Kemp bought the gun that was used. They robbed the victim. Kemp is seen using the card not just once but three times, and then the victim is found nude in the desert, which suggests that someone intended a sexual offense, and we know that Kemp committed this sexual offense subsequently in the Flagstaff motel. So I don't think there would have been a different result even without these two statements. But again, from my perspective, there's absolutely nothing wrong with either of the statements from either Officer Compton or Jackson. But even without those, I think the Edmund Tyson finding has been satisfied. If there are no further questions, that's all I have. Thank you for your argument. Judge Callahan, thank you for the time. The Edmund Tyson finding, the evidence is absolutely equivocal with respect to whether it was Logan or Kemp, if you take Kemp's statements out. The murder weapon was found on Jeffrey Logan when he was arrested in Denver. That gun, the ballistics matched up the bullets found in the desert to the gun that Jeffrey Logan had, not the gun that Tom Kemp had. At the time when Kemp was supposedly using the ATM cards, the debit cards at the ATM, Mr. Logan was the one that was restraining the victim in the homicide. The evidence is simply inconclusive as to who did what out of the debt. And we know that in the trial from Mr. Lee, right? How do we know that? Because we don't get that Mr. Logan's testimony, we don't get to know what Mr. Logan said, right? Relative to Mr. Kemp. Correct. I mean, even though we know all this. And as Your Honor knows, Mr. Logan was holding press conferences with the media at the jail to apportion blame on Mr. Kemp when it was clear what could befall him and his prosecution. So at some point, the trial judge in the Logan case said, I can't trust anything Mr. Logan says, I can't make credibility judgments, he's all over the board with his statements, and I have no basis for making any judgment with regard to Logan other than I think he's a liar. So you're just saying pretty much, okay, but these two officers who really weren't impeached, per se, are what tipped it. That's it. To say that you're, as opposed to what anything Mr. Logan would have said, even though we don't know that for this trial. That's correct, Judge. And the argument that Mr. Catani made that there was evidence immediately after the homicide that Mr. Kemp sexually assaulted a person during a kidnap after the homicide. Jeffrey Logan raped Sandra So. At the same time they were in the motel room in Durango or wherever it was, or Denver. Sandra So was raped by Jeffrey Logan. So to say one of these people has a sexual perversion or does whatever. I don't know what Jeffrey Logan's sexual proclivities were, but I would not bet a month's salary on the fact that because Tom Kemp had fondled Edmund Lee, that he necessarily was the only one or was the one who was sexually assaulting Hector Juarez before he was killed. But it's no longer necessary under Edmund to show that the person actually took the life or intended to take the life. The reckless disregard of being part of the enterprise would also be enough under Tyson. Why is that? Well, it's an interesting essay, Your Honor. In the Tyson case itself, the persons who were also found to be eligible for death under the Eighth Amendment, Tyson's two sons who broke him out of the prison, that was a course of events where one thing happened right after the other. The homicides happened I think on the same day that the prison break occurred, and so the Supreme Court said they should have anticipated that these events would happen. I think the timeline in our case is a little bit elongated, and we can't make that same judgment that that was necessarily within the contemplation. I think in the Tyson case, these people came with guns and all that sort of thing, busted him out in a violent prison escape, and these people were killed, I believe, the same night. I don't know that we have a similar set of facts from which we can conclude that there was reckless disregard. In the Tyson case, it was clear that both of the junior Tysons were involved in the entire event. In this case, we don't know, again, who was present on the desert. If we take Kemp's statement out, and that's why we relegate the suppression claim only to Edmund Tyson, is because if you take that out, you don't know who was out there. If you don't know who was out there, you can't apportion sufficient Eighth Amendment blame to Tom Kemp to make him eligible for the death penalty. Mr. Katani said that I had indicated that even if Mr. Kemp had only said that in response to the officers that I'm charged with killing a Mexican, I conceded that if he thought that narrowly, I said that in my opening remarks, that if he said that narrow statement, it's possible that could not have been construed another way. But if Mr. Kemp deviated from that at all or added anything to it, there certainly could have been an attempt by Mr. Peasley to argue that the statement was a false exculpatory statement and that it really meant that Mr. Kemp was admitting his guilt to the crime. So I think that we're at the point now where Mr. Katani would have us sort of parse out what it is the defendant could have said as opposed to what he said. And I think we're getting far afield from the constitutional protection. You know, in both Edwards and in Bradshaw, Justice Powell wrote separate concurrences in each case because he said, we're announcing in Edwards we've got this initiation requirement. I'm not sure exactly how that works or what that means. And he said it in consecutive cases. And in Bradshaw, he was asking his brethren. It ended up being a 4-4 split. Bradshaw was a plurality opinion, and it was a 4-4 split. And Powell again was in the middle saying, I thought we could get together in this case and try to determine what this initiation requirement really means in Edwards. I see we're having trouble administering it. Well, I guess if I were going to place you in your own patard on this, If four Supreme Court justices think something, how could what the state court do be unreasonable? It's not a statement of clearly established Supreme Court law, Your Honor. And as recently as last year, Judge Scalia says we still have an initiation requirement under Edwards. I mean, it's what the law is. It's not what four judges – I mean, if the four judges couldn't get a fifth vote, Justice Powell only concurred in the judgment. He didn't join their opinion. It's four judges, but it's not the law. It's dicta. It was dicta because Bradshaw was – that was an initiation case. That's where the defendant said, so what's going to happen to me now? And he engaged the officers in the further discussion. So not only was it a plurality decision in Bradshaw, it was dicta by the plurality in Bradshaw. All right. Well, I'm going to ask you to sum up because we're more than over at this point in time. The last point – We're at seven minutes now, so – I appreciate that, Your Honor. The statement Mr. Catani made regarding Officer Jackson and defense counsel's concession that his conversation with Mr. Kemp was probably voluntary after the invocation of the right. Voluntary is still not enough. We know that from Edwards because in Edwards, the U.S. Supreme Court said the defendant is given his Miranda rights. He invokes his right to counsel. They come back the next day, and they simply re-Mirandaize him. And he agrees to waive, and he confesses. The U.S. Supreme Court said that wasn't good enough. Voluntariness is not good enough. Once he makes the invocation, the waiver has to be knowing and intelligent, and voluntariness is simply not enough. And so with regard to Officer Jackson, again, the burden was on the prosecution to prove the valid waiver of the rights. So if Officer Jackson can't remember who initiated, I'm afraid the state loses on that one because they have the burden. All right. Thank you, Your Honor. Thank you for your argument. Thank you both for your argument. This matter will stand submitted. We appreciate it when counsel are both conversant with the record and with the law, and you both did a good job on that. Thank you. Thank you, Your Honor. This question is in recess.
judges: Rymer, Callahan, Ikuta